TRI–COUNTY PAVING, INCORPO-
RATED, Plaintiff–Appellant,

v.

ASHE COUNTY; Ashe County Board
of Commissioners, Defendants–
Appellees.

No. 01–1931.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 5, 2001.

Decided Feb. 22, 2002.

Carolina and the Ashe County Board of Commissioners (collectively "the County") violated its due process and equal protection rights by not issuing a building permit for TCP's proposed asphalt plant, by enacting a one-year moratorium on the building of asphalt plants, and by subsequently enacting a Polluting Industries Development Ordinance. TCP seeks damages and injunctive relief pursuant to 42 U.S.C. § 1983 and the North Carolina Constitution. The district court granted summary judgment for the County. Because TCP was not deprived of a property interest without due process of law, and because the County's actions were rationally related to a legitimate state interest, we affirm the judgment of the district court.

I.

In the mid–1990's, Tri–County Paving began to consider constructing an asphalt plant on its property in an unincorporated portion of Ashe County, North Carolina. Some time prior to August 1997 and again in August 1998, TCP's principal shareholders, Leonard and Lucian Jordan, informally discussed their plans to construct the plant with George Yates, Chairman of the Ashe County Board of Commissioners. In August 1998, TCP purchased a used asphalt plant and moved the disassembled plant to its property. Leonard Jordan also informed the County Planner that TCP was applying to the North Carolina Department of Environment and Natural Resources ("NCDENR") for an air quality permit to operate the plant and requested a consistency determination. On August 26, 1998, the County Planner wrote that TCP's proposed site did not violate any existing County ordinances.

However, TCP's plans to construct and operate an asphalt plant soon met with community resistance. At the October 5,

**ARGUED:** Donald Merritt Nielsen, Kilpatrick Stockton, L.L.P., Winston–Salem, North Carolina, for Appellant. James Redfern Morgan, Jr., Womble, Carlyle, Sandridge & Rice, P.L.L.C., Winston–Salem, North Carolina, for Appellees. **ON BRIEF:** Stephen R. Berlin, Kilpatrick Stockton, L.L.P., Winston–Salem, North Carolina, for Appellant.

Before WILKINSON, Chief Judge, and WILKINS and LUTTIG, Circuit Judges.

Affirmed by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge WILKINS and Judge LUTTIG joined.

**OPINION**

WILKINSON, Chief Judge.

Plaintiff Tri–County Paving, Inc. ("TCP") claims that Ashe County, North

1998 Commissioners' meeting, Chairman Yates voiced concerns over TCP's proposed plant and urged the citizens of the Town of West Jefferson to exercise territorial jurisdiction rights to stop the project. The news of TCP's plans quickly spread through the small, rural county. Two citizen advocacy groups, the Ashe County Citizens Against Pollution and the Blue Ridge Environmental Defense League, requested that a discussion of TCP's proposed plant be included on the agenda of the October 19 Commissioners' meeting.

Meanwhile, on October 15, Leonard Jordan's daughter-in-law requested a building permit for the asphalt plant from the County Inspector's Office. She was told that TCP had to submit a set of signed and sealed blueprints before the County could issue a building permit.[1] The following day, TCP returned to the office to again seek a permit. Taking the evidence in the light most favorable to TCP, the Jordans submitted a set of properly signed and sealed blueprints. It is undisputed however that Robert Reed, the Director of Building Inspections, never issued a building permit to TCP for the plant.

Furthermore, TCP's application for a building permit remained deficient in several respects. TCP did not submit a written application for a building permit, even though the North Carolina Building Code and Ashe County ordinances expressly require a written application before a building permit can be issued.[2] Further, it is undisputed that TCP did not have a wastewater permit and that, under North Carolina law, a wastewater permit is required before a building permit can be issued.[3] TCP did not obtain a wastewater permit until October 18, 1999—over a year after TCP applied for a building permit. It is also undisputed that TCP's initial application to the NCDENR for an air permit was incomplete and that the NCDENR did not issue an air permit until May 10, 1999—almost seven months after TCP applied for a building permit. Under North Carolina law, TCP could not have commenced construction of its asphalt plant without an air permit.[4] In fact, on November 17, 1998, the NCDENR called TCP's engineer to inform him that if TCP "commenced construction" of the plant without an air permit, TCP would be in violation of state law. Robert Reed also stated under oath that he "wouldn't have issued a [building] permit without an air quality control [permit]."

Following their failed attempt to obtain a building permit, Leonard and Lucian

1. The North Carolina Building Code ("N.C.B.C."), which applies to all local governments, requires signed and sealed architectural and engineering drawings for commercial projects over 2,500 square feet or valued over $90,000. *See* N.C.B.C. §§ 302.1, 302.3, and 302.4; Ashe County Ordinance § 150.22.

2. N.C.B.C. § 301.3 provides that an application for a building permit "shall be filed with the [local] Inspection Department on a form furnished for that purpose." And in its building regulations, Ashe County Ordinance § 150.21 states that "[w]ritten application shall be made for all permits required by this chapter and shall be made on forms provided by the Department of Inspections."

3. N.C. Gen.Stat. § 130A–338 provides that "[w]here construction, location or relocation is proposed to be done upon a ... place of business ... no permit required for ... construction, location or relocation activity under any provision of general or special law shall be issued until an authorization for wastewater system construction has been issued."

4. N.C. Gen.Stat. § 143–215.108 makes clear that until a party has applied for and received an air permit from NCDENR they may not "[b]uild, erect, use or operate any equipment which may result in the emission of air contaminants or which is likely to cause air pollution."

Jordan attended the October 19, 1998 Commissioners' meeting, where a spirited public debate ensued regarding TCP's proposed asphalt plant. It is clear that the Jordans had notice that TCP's plant would be discussed at the meeting and that the Jordans spoke on behalf of the project during the meeting. The Commissioners ultimately passed, by a vote of 3–2, an ordinance placing a one-year moratorium on the construction of asphalt plants in unincorporated portions of Ashe County. Because the first vote on the moratorium was not unanimous, a second reading was required and the moratorium was scheduled to be taken up at the next Commissioners' meeting on November 18, 1998. The Jordans had notice that TCP's asphalt plant would be discussed at the November meeting by virtue of their attendance at the first meeting. And Leonard Jordan actually attended the second meeting, where the moratorium again passed by a vote of 3–2. The moratorium included a provision allowing a party to appeal to the Commissioners for a variance in cases of severe hardship. However, TCP did not apply for or receive a variance under the moratorium.

Near the end of the moratorium period, the Commissioners passed the Ashe County Polluting Industries Development Ordinance ("PIDO"), which required a polluting industry to obtain a special use permit from the County Planning Department, and prohibited the location of a polluting industry within 1,000 feet of a residence or within 1,320 feet of any school, daycare, hospital or nursing home. *See* Ashe County Ordinance §§ 159.01–159.08, § 159.99. Because it does not have a comprehensive zoning ordinance, the County enacted both the moratorium and the PIDO pursuant to its general police power under N.C. Gen. Stat. § 153A–121, which allows a county to pass ordinances to protect the health, safety, or welfare of its citizens. Like the moratorium, the PIDO contained a variance process and authorized the County Planning Board to issue a variance if strict adherence to the PIDO "would cause an unnecessary hardship." Ashe County Ordinance § 159.07. TCP did not receive a variance or permit to construct its asphalt plant after the enactment of the PIDO.

■ In July 1999, TCP initiated this action, alleging that the County violated its due·process and equal protection rights by denying it a building permit and by passing the moratorium and the PIDO. TCP also alleged that the PIDO was unconstitutionally vague.[5] TCP sought relief pursuant to 42 U.S.C. § 1983 and the North Carolina Constitution.[6] The district court granted summary judgment to the County with respect to all of TCP's claims. The court held that TCP's procedural due process claim failed because TCP did not have a vested property right to construct or operate an asphalt plant. The court concluded that TCP's substantive due process claim also failed because TCP lacked a valid property interest and because the County's actions were not beyond the

**5.** TCP did not raise a takings claim. Therefore, we have no reason to consider any takings issues raised in *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* 216 F.3d 764 (9th Cir.2000), *cert. granted,* 533 U.S. 948, 121 S.Ct. 2589, 150 L.Ed.2d 749 (2001).

**6.** TCP has failed to assert any distinction between its federal and state claims. And North Carolina courts have consistently interpreted the due process and equal protection clauses of the North Carolina Constitution as synonymous with their Fourteenth Amendment counterparts. *See, e.g., Simeon v. Hardin,* 339 N.C. 358, 451 S.E.2d 858, 871 (1994); *In re Moore,* 289 N.C. 95, 221 S.E.2d 307, 309 (1976); *see also Browning–Ferris Indus. v. Wake County,* 905 F.Supp. 312, 323 (E.D.N.C. 1995).

broad limits of legitimate governmental action. The district court similarly rejected TCP's equal protection claim, finding that the County's actions were rationally related to a legitimate governmental end. Finally, the district court rejected TCP's vagueness claim, finding that the terms in the PIDO were "reasonably determinable by people of common intelligence." TCP appeals.

## II.

### A.

We begin by considering TCP's procedural due process claim. In order to state a valid procedural due process claim, TCP must demonstrate: (1) that it had a property interest; (2) of which the County deprived it; (3) without due process of law. *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 826 (4th Cir.1995). It is well-settled that the Fourteenth Amendment itself does not create property interests. "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Further, to have a property interest in a benefit, a person must have a "legitimate claim of entitlement to it." *Id.* A mere "abstract need or desire for it" or "a unilateral expectation of it" is insufficient. *Id.*

Due process of law generally requires that a deprivation of property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950). *See also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). However, "to determine whether a procedural due process violation has occurred,

courts must consult the entire panoply of predeprivation and postdeprivation process provided by the state." *Fields v. Durham*, 909 F.2d 94, 97 (4th Cir.1990) (citing *Zinermon v. Burch*, 494 U.S. 113, 126, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)). The procedures due in zoning cases, and by analogy due in cases such as this one involving regulation of land use through general police powers, are not extensive. For example, the Supreme Court held in *City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976), that a local government could, consistent with the Due Process Clause, make zoning decisions through the political process in a referendum with no hearings of any kind. *See id.* at 677, 679, 96 S.Ct. 2358; *see also River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 166–67 (7th Cir.1994) (discussing *Eastlake* and concluding that "the procedures 'due' in zoning cases are minimal").

### B.

We will assume without deciding that TCP had a property interest in obtaining a building permit to construct an asphalt plant and that the County deprived TCP of this property interest. However, the County did not deprive TCP of its property interest without due process of law. Summary judgment was therefore appropriate on TCP's procedural due process claim. TCP was provided with more than constitutionally adequate pre-and postdeprivation process in this case. TCP failed to take advantage of much of it. And when TCP did take advantage of the available process, the outcome was not what it had hoped for. But procedural due process does not require certain results— it requires only fair and adequate procedural protections.

The County provided TCP with an abundance of predeprivation process. First,

there is no evidence that TCP was denied the opportunity to submit the documentation necessary to qualify for a building permit. TCP was allowed full access to the County Building Inspector's office on numerous occasions and the Jordans often spoke directly with Robert Reed, the Director of Building Inspections, regarding TCP's permit application. Lucian Jordan stated in deposition testimony that he and Leonard Jordan applied for a permit "several times in October and November 1998 and many times after that" and "would just drop in [at Reed's office] and tell them we needed a building permit." Leonard Jordan similarly testified that he and Lucian "asked for a building permit on many occasions." However, TCP never submitted a complete application—it lacked a written application, a wastewater permit, and an air quality permit. The County was under no obligation to issue a building permit without the required documentation and permits. Indeed, if the County had issued a building permit it would have violated North Carolina statutes, the North Carolina Building Code, and an Ashe County ordinance. *See* N.C.B.C. § 301.3 (written application requirement); Ashe County Ordinance § 150.21 (same); N.C. Gen.Stat. § 130A–338 (wastewater permit requirement); N.C. Gen.Stat. § 143–215.108 (air quality permit requirement).

The County also provided TCP with adequate process before the moratorium and the PIDO were enacted by giving TCP both notice and an opportunity to be heard. The Jordans were given notice that TCP's asphalt plant would be discussed at the Commissioners' meeting on October 19, 1998. Lucian Jordan testified that the County Manager informed him and Leonard that "there was a group that was going to speak at the Commissioners' meeting in opposition to [the plant]." The Commissioners' meeting was open to the public and the Jordans attended. At the meeting, members of citizen advocacy groups spoke against the asphalt plant, while the Jordans spoke on behalf of it. The Jordans explained that they had spoken "to Chairman Yates several months ago and told him of their intentions to build a plant," that they had received a consistency determination from the County Planner, and that they "ha[d] been working with [the County Planner] and the [NCDENR] to apply for permits." The Commissioners listened to both sides of the debate before passing the moratorium.

During the October meeting, the Jordans were given notice that the plant and the moratorium would again be discussed at the November 18, 1998 Commissioners' meeting. Leonard Jordan testified that he attended this second meeting and that he also attended the Commissioners' meeting on November 15, 1999, when the PIDO was discussed and passed. TCP was given the opportunity to comment at these public meetings. TCP simply lost the political battle in the County. If, as *Eastlake* teaches, a community can make land-use decisions through a popular referendum with no hearings of any kind and still satisfy the mandates of due process, certainly conducting open community meetings and giving affected parties the opportunity to speak on behalf of their project is constitutionally sufficient.

■ However, predeprivation process was not the only avenue open to TCP. Postdeprivation process was likewise available. And a "due process violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Fields*, 909 F.2d at 98 (quoting *Zinermon*, 494 U.S. at 126, 110 S.Ct. 975).

There were numerous postdeprivation remedies available to TCP to rectify what it believed to be a wrongful denial of its right to build an asphalt plant. TCP failed to take advantage of them. First, TCP could have applied to the Commissioners for a variance under the moratorium, or could have applied to the County Planning Board for a variance under the PIDO. The moratorium contained a provision allowing parties to apply to the Commissioners for a variance in "situations where a severe hardship may arise," and mandated that the Commissioners "hold a public hearing on the subject" before making a decision on any variance request. The PIDO contained a similar provision allowing parties to apply to the Planning Board for a variance "[w]here strict adherence to the provisions of [the PIDO] would cause an unnecessary hardship." Ashe County Ordinance § 159.07. Yet TCP did not apply for a variance under the moratorium and has never properly applied for one under the PIDO.[7]

■■■■ Additionally, TCP had remedies available to it in the state courts but chose not to utilize them. For example, TCP could have petitioned a state court for a writ of mandamus to compel the County to issue a building permit if it was unlawfully withheld. North Carolina courts have stated that mandamus is the proper procedure to compel local officials to issue a building permit when a party shows that it has met all of the permit requirements. *See, e.g., Lee v. Walker,* 234 N.C. 687, 68 S.E.2d 664, 671–72 (1952); *Clinard v. City of Winston–Salem,* 173 N.C. 356, 91 S.E. 1039, 1040 (1917); *Buckland v. Town of Haw River,* 141 N.C.App. 460, 541 S.E.2d 497, 499 (2000).[8] TCP also could have filed an inverse condemnation suit in state court. *See, e.g., Robertson v. City of High Point,* 129 N.C.App. 88, 497 S.E.2d 300, 302–03 (1998); *Smith v. City of Charlotte,* 79 N.C.App. 517, 339 S.E.2d 844, 847–48 (1986); N.C. Gen.Stat. § 40A–51. TCP chose not to pursue any of these avenues of relief in the state courts. It therefore cannot complain now that the state did not provide adequate procedures.

## III.

### A.

■■■■ We next turn to TCP's claim that the County violated its equal protection rights. The Supreme Court has made clear that when no fundamental right or suspect classification is at issue, the Equal Protection Clause allows a legislative body wide latitude in drawing classifications. Social or economic legislation "will be sustained if the classification drawn ... is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citing *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976)). TCP does not allege that the County has bur-

---

**7.** There is some dispute about this. TCP claims that it applied for a variance under the PIDO after the district court issued its opinion in this case. However, there is no evidence in the record to support TCP's claim, and it is undisputed that TCP has not received a variance. In any event, the point is the availability of adequate process, not the outcome.

**8.** TCP correctly notes that the statutory authority in N.C. Gen.Stat. §§ 1–511 to 1–513 for North Carolina courts to grant a writ of mandamus was repealed effective January 1, 1970. However, North Carolina courts have subsequently held that the writ of mandamus is still available through the equitable remedy of mandatory injunction, and that the substantive grounds for granting the writ have not changed. *See, e.g., Sutton v. Figgatt,* 280 N.C. 89, 185 S.E.2d 97, 99 (1971); *Carter v. N.C. Bd. of Registration,* 86 N.C.App. 308, 357 S.E.2d 705, 709 (1987).

dened a fundamental right or employed a suspect classification. Therefore, we apply the most deferential standard of review to the County's actions under the Equal Protection Clause. *See, e.g., Sylvia,* 48 F.3d at 820; *Int'l Sci. & Tech. Inst., Inc. v. Inacom Communications, Inc.,* 106 F.3d 1146, 1156–57 (4th Cir.1997).

### B.

The district court properly granted summary judgment with respect to TCP's equal protection claim. First, as the district court noted, we need look only to the text of the moratorium and the PIDO to uncover the County's legitimate governmental purpose. The moratorium stated that its purpose was "to protect the public health, safety, general welfare, and property values of citizens of Ashe County from potential adverse health effects caused by [asphalt] facilities." The PIDO stated a similar purpose with respect to all polluting industries and went on to make clear that it was intended to "allow for the placement and growth of polluting industrial activities, while maintaining the health, safety and general welfare standards of established residential and commercial areas in Ashe County." Ashe County Ordinance § 159.02. Further, there is no evidence that the County's objectives were any less legitimate when it denied TCP's building permit. Promoting the health, safety, and well-being of the County's citizens are basic governmental functions. And this court will not substitute its policy judgments as to the exercise of the police power for those of a democratically elected local government. *See, e.g., Sylvia,* 48 F.3d at 820.

Second, the County's actions were rationally related to these legitimate ends. We have previously stated that the relevant question under rational-basis review is whether local officials "reasonably could have believed that [their] action was rationally related to a legitimate governmental interest." *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal,* 135 F.3d 275, 290 (4th Cir. 1998). The actual motivation for the County's actions are irrelevant. *See, e.g., United States R.R. Ret. Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980). Here, the County officials could certainly have believed that passing the moratorium and the PIDO were rationally related to their legitimate interest in protecting the health and safety of Ashe County's citizens. Both the moratorium and the PIDO sought to limit polluting industries' proximity to citizens, especially school children and those in need of medical care. For example, the PIDO prohibited a polluting industry from locating "within 1,000 feet, in any direction, of a residential dwelling unit or commercial building," or "within 1,320 feet of any school, daycare, hospital or nursing home facility." Ashe County Ordinance § 159.06(B). It is rational for a community to decide that it does not want polluting industries, such as asphalt plants, in close proximity to residences, schools, daycare centers, hospitals, or nursing homes.

TCP attempts to save its equal protection claim by arguing that it was treated differently from other "similarly situated" persons or businesses in the County. The Supreme Court made clear in *Village of Willowbrook v. Olech,* 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000), that a party can bring an equal protection claim by alleging it has "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564, 120 S.Ct. 1073. TCP argues that it was treated differently from permit applicants who sought other sorts of residential and commercial building per-

mits, and differently from the one existing asphalt plant in Ashe County.

We are unpersuaded. TCP has not provided evidence that it was irrationally or arbitrarily treated differently from similarly situated parties. In fact, TCP has failed to present evidence that the County intentionally treated TCP differently from any similarly situated entity. All TCP has shown is that other businesses in Ashe County were granted building permits while its application was denied, and that a 30–year old asphalt plant continued to operate in the County.

The County's granting of other building permits is irrelevant because TCP has not shown that any other company applied for a permit to construct a facility with environmental and safety concerns similar to an asphalt plant. Nor has TCP shown that any other building permit applicant met with the kind of public apprehension that TCP's proposed plant generated. The existing asphalt plant's continued operation is likewise inapposite because the County's actions dealt with future, further development and did not affect existing industry. Thus, TCP has failed to state a valid equal protection claim.

## IV.

### A.

■■■ Finally, we address TCP's substantive due process claim. In order to validly state such a claim, TCP must demonstrate: "(1) that [it] had property or a property interest; (2) that the state deprived [it] of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." *Sylvia*, 48 F.3d at 827. *See also Front Royal*, 135 F.3d at 287–88. Substantive due process protections "run only to state action

so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." *Rucker v. Harford County*, 946 F.2d 278, 281 (4th. Cir.1991).

### B.

■■■ The district court properly granted summary judgment with respect to TCP's substantive due process claim. We will again assume without deciding that TCP had a property interest and that the County deprived it of that property interest. However, TCP's claim that the County violated its substantive due process rights fails as a matter of law under the third prong of the *Sylvia* test. The County's actions clearly did not fall beyond the outer limits of legitimate governmental action. In fact, quite the opposite is true. The County's actions were rationally related to a legitimate governmental purpose. Therefore, TCP cannot demonstrate that the County's actions were arbitrary or irrational as required by *Sylvia* and *Rucker*.

■■■ TCP argues that the County's enactment of the moratorium and the PIDO pursuant to N.C. Gen.Stat. § 153A–121's general grant of police power, rather than through the specific statutory provisions governing zoning, violated North Carolina law. *See Vulcan Materials Co. v. Iredell County*, 103 N.C.App. 779, 407 S.E.2d 283, 286 (1991) (stating that "[i]f an ordinance substantially affects land use, it must be enacted under the procedures which govern zoning and rezoning"). TCP asserts that the County's alleged violation of state law demonstrates that the County acted arbitrarily and violated TCP's substantive due process rights. However, the district court concluded that the County's regulation of land use under its general police

powers was consistent with North Carolina law. Section 153A–121 explicitly states that "[a] county may by ordinance define, regulate, prohibit, or abate acts, omissions, or conditions detrimental to the health, safety, or welfare of its citizens." And North Carolina courts after *Vulcan* have stated that "[c]ounties may enact ordinances regulating land use in two fashions: one, pursuant to a comprehensive zoning plan, N.C. Gen.Stat. § 153A–341 (1991), and two, pursuant to their police powers, N.C. Gen.Stat. § 153A–121 (1991)." *Maynor v. Onslow County*, 127 N.C.App. 102, 488 S.E.2d 289, 291–92 (1997).

■■■ More importantly, whether the County violated state law in regulating land use is not determinative of whether TCP's substantive due process rights were violated. If state law is transgressed, state courts are open to redress that violation and remedy an unlawful deprivation of property. We have repeatedly stated that "governmental actions that are violative of state law are properly challenged in state courts which exist, in part, to protect citizens from abuses of state law." *Front Royal*, 135 F.3d at 288. *See also Sylvia*, 48 F.3d at 829; *Love v. Pepersack*, 47 F.3d 120, 123 (4th Cir.1995). And the fact that state courts are available to redress and correct violations of state law "belies the existence of a substantive due process claim." *Sylvia*, 48 F.3d at 829. As previously discussed, the North Carolina courts were available for TCP to challenge the County's actions. But TCP did nothing to pursue its claim in state court. TCP cannot now argue that the County's alleged

violation of state law infringed its substantive due process rights.

■■■ This conclusion is entirely consistent with our opinion in *Scott v. Greenville County*, 716 F.2d 1409 (4th Cir.1983), where a developer claimed that Greenville County's failure to issue him a building permit for construction of low-income housing violated due process. In *Scott*, the South Carolina Supreme Court had previously concluded that there was "no basis for the intrusion by the County Council into the zoning certificate and building permit process" at issue. *Scott*, 716 F.2d at 1419 (quoting *Scott v. Carter*, 273 S.C. 509, 257 S.E.2d 719, 722 (1979)). Greenville County's action was not related to any legitimate interest such as protecting the health or welfare of county residents. This court therefore concluded that, even if Scott failed to prove racially discriminatory motivation in the county's decisions, summary judgment for the county was inappropriate because Scott's property interest had been "taken from him by manifest arbitrariness and unfairness." *Scott*, 716 F.2d at 1421. In contrast, Ashe County's actions in this case were far from arbitrary—they were grounded in rational health and safety concerns.[9]

## V.

■■■ States and localities possess "traditional and primary power over land and water use." *Solid Waste Agency v. United States Army Corps of Eng'rs*, 531 U.S. 159, 174, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001). Indeed, state and local governments have established political and judi-

---

**9.** TCP also alleges that the PIDO is unconstitutionally vague or indefinite. A law is unconstitutionally vague if it is not "sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties," and if "men of common intelligence must necessarily guess at its

meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). We agree with the district court that the PIDO is sufficiently clear and that people of common intelligence can determine the meaning of its terms.

cial procedures to resolve just the sort of question presented by this case. North Carolina law did not run afoul of the Fourteenth Amendment's basic guarantee of due process. To go further and essentially require that law to guarantee outcomes is to constitutionalize what remains at heart a local democratic dispute. We decline to do so, lest we wrest decisions from the very people who will be most affected by them.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED.*