EXPRESS CARWASH OF CHAR-
LOTTESVILLE, L.L.L.P., by and
through Henry Weinschenk, its Gen-
eral Partner, Plaintiff

v.

CITY OF CHARLOTTESVILLE; Char-
lottesville City Council; Gary O'Con-
nell, City Manager, sued in his official
capacity, City of Charlottesville De-
partment of Public Works; City of
Charlottesville Public Utilities; Ju-
dith Mueller, Director of Public
Works, sued in her official capacity;
J.G. Palmborg, Public Utilities Man-
ager, sued in his official capacity;
John Doe Individuals 1–10; Doe Gov-
ernmental Entities 1–10; Doe Part-
nerships, Corporations, Fiduciaries, or
Other Entities 1–10, Defendants.

No. CIV.A.3:03 CV 00057.

United States District Court,
W.D. Virginia,
Charlottesville Division.

May 27, 2004.

R. Frazier Solsberry, Charlottesville, VA, for Plaintiff.

John Walter Zunka, Richard H. Milnor, Taylor Zunka Milnor & Carter Ltd., Charlottesville, VA, for Defendants.

## MEMORANDUM OPINION

MICHAEL, Senior District Judge.

The plaintiff in this action seeks various forms of relief for losses incurred as a result of water usage restrictions imposed during a period of severe drought in Charlottesville, Virginia. The defendants responded by filing motions to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief could be granted. The magistrate judge recommended that this court grant the defendants' motions to dismiss. After a thorough examination of the plaintiff's objections to the magistrate judge's report and recommendation, the supporting memoranda, the applicable law, and the report and recommendation, this court adopts the analysis and findings of the magistrate judge. The court accepts his recommendation to grant the defendants' motions to dismiss.

### I. FACTS

During the summer of 2002, the Commonwealth of Virginia experienced severe drought conditions. In response, the Governor declared a state of emergency and instituted various restrictions on usage of surface and ground water. In Charlottesville, the lack of rainfall contributed to a reduction in the reservoir level to sixty percent of capacity. The City Council responded to these crisis conditions by amending the water use restrictions set forth in city ordinances.

As amended, the particular ordinance at issue established both "Phase I" and "Phase II" restrictions. Phase I restrictions were those restraints on water usage to remain in effect until the City Council

found that the state of emergency in Charlottesville had abated. The following restrictions were ordained:

1) Watering of outside shrubbery, trees, lawns, grass, plants, home vegetation, except from a watering can or other container not exceeding three (3) gallons in capacity. This limitation [did] not apply to commercial greenhouses or nursery stocks, which [could] be watered in the minimum amount required to preserve plant life before 7:00 a.m. or after 8:00 p.m.

2) Washing of automobiles, trucks, trailers, or any other type of mobile equipment, except in licensed commercial vehicle wash facilities.

3) Washing of sidewalks, streets, driveways, parking lots, service station aprons, exteriors of homes or apartments, commercial or industrial buildings or any other outdoor surface, except where mandated by federal, state or local law.

4) The operation of any ornamental fountain or other structure making a similar use of water.

5) The filling or refilling of swimming or wading pools of any size. As used [therein], the phrase 'filling or refilling' [meant] the addition of any water to the pool from the public water supply after the adoption of [the] amended ordinance.

6) The use of water from fire hydrants for any purpose other than fire suppression, unless otherwise approved by the City Manager.

7) The serving of drinking water in restaurants, except upon request.

8) The operation of any water-cooled comfort air conditioning that [did] not have water conserving equipment in operation.

Charlottesville, Va., Code § 31–125(a) (2002).

Phase II restrictions, which were to remain in effect from September 17, 2002 until the usable water supply in the urban reservoir system had attained an average of at least eighty-five percent of capacity for seven consecutive days, augmented the Phase I restrictions and imposed more onerous burdens on the citizens of Charlottesville. These restrictions including the following:

1) All water leaks [had to] be repaired within three (3) business days after notification by the City.

2) All washing of automobiles, trucks, trailers, and any other type of motor vehicle or mobile equipment [was] prohibited.

3) Watering of athletic fields [was] prohibited.

4) All businesses, institutions, and governmental entities [were required to] develop a written plan, available for inspection by the City, which [would] reduce the [then] current use of water by that business or institution by twenty percent (20%), other than what [was] necessary for the sanitary and drinking needs of its employees and invitees.

5) All businesses and institutions [were required to] place signs at each main entrance and in each restroom and shower indicating the existence of a water supply emergency and encouraging the conservation of water.

6) All commercial lodging establishments [were required to] adopt a policy which [limited] the daily changing of washable linens and towels, and [to] communicate that policy to their employees and guests.

7) The use of showers in health, fitness, and athletic clubs [was] prohibited, except showers equipped with low flow or flow reducing equipment.

*Id.* Other restrictions were also included in the amended ordinance in the event that the measures adopted in § 31–125(a) did not preserve sufficient supplies of water. § 31–125(c); *see also* § 31–153 (providing water conservation rate increases). The Phase II restrictions were lifted on November 18, 2002.

Violations of the ordinances were subject to ascending penalties. § 31–125(d). For the first offense, violators were to receive a written warning from the City of Charlottesville Department of Public Works. § 31–125(d)(1). A second offense warranted a fine of $250, while a third offense resulted in a fine of $500, each of which was to be added to the next water bill. § 31–125(d)(2) & (3). The fourth offense, and each subsequent offense thereafter, was to be treated as a Class 1 misdemeanor. § 31–125(d)(4). The ordinance also provided a means to appeal any one of these penalties, with the exception of mere notice of a violation: "Any person assessed a penalty pursuant to paragraphs (d)(2) or (3)[had] the right to challenge the assessment by invoking the appeals procedure established pursuant to [§ 31–125(b) ]." § 31–125(d).

The appeals procedure thus utilized, but may be distinguished from, the subsection of the ordinance that governed application for exemptions from the water usage restrictions. This subsection directed the City Manager to establish a procedure to review exemptions on a case by case basis and, if warranted, to make equitable adjustments to such provisions. § 31–125(b). In addition, the City Manager was authorized by this section to promulgate regulations governing the granting of exemptions applicable to all or some of the uses of the water supply set forth in the ordinance. *Id.* When considering the applications, the City Manager was directed to "balance economic and other hardships to the appli-

cant resulting form the imposition of water use restrictions or allocations against the individual and cumulative impacts to the water supply resulting from the granting of exemptions." *Id.*

On September 20, 2002, after implementation of the Phase II restrictions, Mr. J.G. Palmborg, Public Utilities Manager, issued a written warning to Express Carwash for "wet-washing" cars on the same day. (Ex. C.) There is no dispute that Express Carwash was in violation of the ordinance as detailed in Mr. Palmborg's letter. After receiving this warning, Express Carwash submitted a letter to Judith Mueller, Director of Public Works, applying for an exemption to the water usage restrictions. Although partially styled as an "appeal," the appeals process was simply unavailable to the plaintiff absent the imposition of an actual fine. § 31–125(d) (providing the right to challenge the assessment to "[a]ny person assessed a penalty pursuant to paragraphs *(d)(2) or (3),*" not paragraph (d)(1)) (emphasis added).

This letter detailed the plaintiff's argument that the restrictions imposed an undue burden on its business. At the time, the loss of business was estimated at $35,000 to $45,000 per month. In the complaint, the plaintiff now estimates that the total loss incurred when the Phase II restrictions were in place amounted to $60,000. The plaintiff also alleges that the entire carwash industry in the City of Charlottesville and the County of Albemarle used only seven-tenths of one percent of the typical daily water consumption. Express Carwash cites this fact to support its argument that other businesses that used more water should have also been subject to similar restrictions. The plaintiff has now brought these arguments to this court.

## II. PROCEDURAL POSTURE

On June 25, 2003, the plaintiff instituted this action asserting various federal and state law claims. Express Carwash contends that the amendments to the city ordinance constituted a regulatory taking in violation of the Takings Clause of both the United States Constitution and the Virginia Constitution. In support of this claim, the plaintiff alleges that the water restrictions 1) interfered with a reasonable investment-backed expectation that the business would be permitted to use city water at least to the same extent or under the same conditions as other businesses, 2) deprived the plaintiff of all economically viable use of his land, and 3) did not substantially advance a legitimate government interest in light of the difference in usage rates between the carwash industry and other local businesses. The plaintiff also asserts that the ordinance was a violation of the Equal Protection Clause of the United States Constitution and of the Special Legislation Clause of the Virginia Constitution. In support of this claim, the plaintiff asserts that the restrictions bear no rational relationship to any legitimate end because other businesses that used more water were not also restrained to the same extent. Express Carwash asks for declaratory relief, injunctive relief, compensatory damages, and attorney fees. In response, the defendants filed motions to dismiss for lack of subject matter jurisdiction and for failure to state a claim. In the event that this court dismissed the federal claims, the defendant also moved the court to decline to exercise supplemental jurisdiction over any remaining state law claims or to abstain from adjudicating the state law claims. The defendants also asked that the court deny the declaratory judgment claim as moot.

On November 20, 2003, the matter was referred to Magistrate Judge Crigler for

his report and recommendation, which he filed on March 31, 2004 ("Report and Recommendation").[1] In the Report and Recommendation, he recommended that the defendants' motions to dismiss be granted. The plaintiff has filed timely objections to the Report and Recommendation.

### III. Standard of Review

This court "shall make a de novo determination of those portions of the report ... to which the objection is made." 28 U.S.C. § 636(b)(1)(C) (2000). First, with respect to the motion to dismiss for lack of subject matter jurisdiction, the plaintiff has the burden of showing that jurisdiction is proper. *Shooting Point, L.L.C. v. Cumming*, 238 F.Supp.2d 729, 735 (E.D.Va. 2002). When evaluating the plaintiff's case, the court may "look beyond the jurisdictional allegations of the complaint," but need not draw argumentative inferences in the plaintiff's favor. *DeBauche v. Virginia Commonwealth Univ.*, 7 F.Supp.2d 718, 721 (E.D.Va.1998).

To decide a motion to dismiss under Rule 12(b)(6), the court must determine "whether the complaint under the facts alleged and under any facts that could be provided in support of the complaint, is legally sufficient." *E. Shore Mkts., Inc. v. J.D. Assocs.*, 213 F.3d 175, 180 (4th Cir. 2000). "A court, when ruling on a 12(b)(6) motion to dismiss, can consider any documents attached to the complaint or incorporated in the complaint by reference." *Hammonds v. Builders First Source–Atl. Group, Inc.*, 2002 WL 535071, at *2 (W.D.Va. Mar. 28, 2002). The court must "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations ... [but] need not accept the legal conclusions drawn from the facts ... [or] accept as true unwar-

ranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc.*, 213 F.3d at 180 (citations omitted). "A motion to dismiss for failure to state a claim for relief should not be granted 'unless it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Id.* (quoting *G.E. Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 548 (4th Cir.2001)).

### IV. Discussion

### A. Federal Takings Clause Claim

The defendants move to dismiss the plaintiff's Federal Takings Clause claim on the ground that this court lacks subject matter jurisdiction. The defendants reason that because the plaintiff has failed to utilize available state court procedures and remedies, the claim is not yet ripe for review. The plaintiff responds by distinguishing between the need to exhaust the state remedial scheme and the need to obtain a final administrative decision.

■ "[A] claim that the application of government regulations effects a taking of a property interest is not ripe until [1] the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue," and [2] the property owner has sought "compensation through the procedures the State has provided for doing so." *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186, 194, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). *See also Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal*, 135 F.3d 275, 283 (4th Cir.1998); *Greenspring Racquet Club, Inc. v. Balt. County, Md.*, 232 F.3d 887, 2000 WL

---

1. The magistrate judge filed his original report and recommendation on March 24, 2004, but subsequently filed a substituted report to correct a minor typographical error.

1624496, at *4 (4th Cir.2000) (unpublished disposition); *Bryant Woods Inn, Inc. v. Howard County, Md.*, 124 F.3d 597, 602 (4th Cir.1997).

The court will assume for the moment that the decision reached by the City Manager was final. While the court has noted the problematic nature of the plaintiff's "appeal," the plaintiff in fact did attempt to obtain an exemption from the Phase II restrictions. The lack of response from the City Manager is disconcerting but need not control the outcome of this case in its current posture. The failure of the City Manager to respond, when considered with the warning the plaintiff received, the relative clarity of the regulations in question, and the discrete nature of the period during which the regulations were in force, could support the conclusion that "the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury." *Williamson County*, 473 U.S. at 193, 105 S.Ct. 3108.

█ Even if it has obtained a final decision from the government entity charged with implementing the regulations, the plaintiff must also first seek compensation through procedures provided by the state before its claim is ripe in this court. In the words of the Supreme Court:

> The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation. Nor does the Fifth Amendment require that just compensation be paid in advance of, or contemporaneously with, the taking; all that is required is that a 'reasonable, certain, and adequate provision for obtaining compensation' exist at the time of the taking. If the government has provided an adequate process for obtaining compensation, and if resort to that process 'yields just compensation,' then the property owner 'has no claim against the Government' for a taking.... [I]f a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation.

*Id.* at 194–95, 105 S.Ct. 3108 (internal citations and attributions omitted). Unless the postdeprivation remedy is unavailable or inadequate, "the State's action is not 'complete' in the sense of causing a constitutional injury." *Id.* at 195, 105 S.Ct. 3108.

█ Without expressing any opinion as to the merit of the plaintiff's claims, the court observes that Express Carwash could pursue a postdeprivation remedy in state court through a declaratory judgment action, a constitutional takings action, a common law damage action to enforce the due process rights of the state constitution, or an inverse condemnation action. *See Front Royal*, 135 F.3d at 280; *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal*, 945 F.2d 760, 765 (4th Cir.1991); *accord Shooting Point, L.L.C.*, 238 F.Supp.2d at 740 (noting that "Virginia provides both a statutory and constitutional mechanism by which a property owner [may] obtain compensation for an alleged taking"); *Pasquotank Action Council, Inc. v. City of Virginia Beach*, 909 F.Supp. 376, 380 (E.D.Va. 1995) (same). There is no dispute that the plaintiff has not pursued these remedies.

The plaintiff argues that Virginia jurisprudence would not permit a state court to conclude a noncategorical taking had occurred while federal jurisprudence on the same subject might allow the claim. This argument, however, does not obviate the federal requirement that the plaintiff first pursue its postdeprivation remedy in state court. As the magistrate judge noted, the plaintiff's argument somewhat alters the allegation set forth in the complaint that the water restrictions in question amounted to a categorical taking and deprived the

Express Carwash of all economically viable use of its property.[2] Notwithstanding this incongruence, the plaintiff essentially has raised a claim that the state postdeprivation remedies are unavailable or inadequate. *Williamson County*, 473 U.S. at 194, 105 S.Ct. 3108. Based upon the analysis of the magistrate judge, the court rejects this contention. If nothing else, it is clear that recent developments in Supreme Court jurisprudence—if those developments can be said to validate the plaintiffs's claim in the first instance, *but see Tahoe–Sierra Preserv. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 332, 335 n. 30, 342, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002)—could support, in theory, a nonfrivolous argument for a change in Virginia jurisprudence. *See City of Virginia Beach v. Bell*, 255 Va. 395, 400 n. 6, 498 S.E.2d 414 (1998) (explaining that, when "interpreting art. 1, § 11 of the Constitution of Virginia, [the Supreme Court of Virginia] [has] cited to and sought guidance from cases involving takings under the Fifth Amendment").[3] The mere fact that the plaintiff has a tough row to hoe in state court does not excuse it from pursuit of state remedies. *See Front Royal*, 135 F.3d at 280, 282 (inferring that plaintiff was required to make good-faith effort to pursue state remedy even when Virginia law was relatively well established). The futility exception is not designed to permit a claim to proceed when the plaintiff's case

in state court would be difficult, but not impossible: King Sisyphus the plaintiff is not.

For the foregoing reasons, the court will overrule the plaintiff's objection and grant the defendant's motion to dismiss for lack of subject matter jurisdiction.[4] The plaintiff's claim is not ripe because it has not pursued available state remedies. Pursuant to the instruction of the Fourth Circuit Court of Appeals, the court advises the plaintiff that it "may wish to make an *England*-type reservation of [its] right to return to federal court, if need be, when [it] first appear[s] in state court." *Front Royal*, 135 F.3d at 283.

### B. Federal Equal Protection Clause Claim

The court will also dismiss the plaintiff's Equal Protection Clause claim. "The Supreme Court has made clear that when no fundamental right or suspect classification is at issue, the Equal Protection Clause allows a legislative body wide latitude in drawing classifications. Social or economic legislation 'will be sustained if the classification drawn ... is rationally related to a legitimate state interest.' " *Tri–County Paving, Inc. v. Ashe County*, 281 F.3d 430, 438 (4th Cir.2002) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). The plaintiff does not allege that a fundamental right has been burdened or a sus-

---

2. Indeed, given the current allegations in the plaintiff's (unamended) complaint, the court need not proceed any further. The plaintiff has alleged a deprivation of all economic use of his property. In theory, at least, such an allegation would support a cause of action under article I, section 1 of the Virginia Constitution. *Bd. of Supervisors of Prince William County v. Omni Homes, Inc.*, 253 Va. 59, 72, 481 S.E.2d 460 (1997).

3. The court does not mean to suggest that the Supreme Court's recent pronouncements in *Tahoe–Sierra* have worked some sea change in

the law in the plaintiff's favor. It is conceivable to the court that the plaintiff misapprehends the strength of his federal case while simultaneously overestimating the gap in state and federal jurisprudence.

4. Offering that the plaintiff failed to allege a categorical taking and that the restrictions were imposed pursuant to emergency conditions, the defendants also move to dismiss this count for failure to state a claim. The court declines to reach the merits of the defendants' motion at this juncture.

pect classification employed. Therefore, the standard of review of the City's actions is one of deference.

■ First, as in *Tri–County Paving,* this court "need look only to the text of the [ordinance] to uncover the [City's] legitimate governmental purpose." 281 F.3d. at 439. "[The City Council] determined and found that a state of emergency continue[d] to exist ... due to extreme drought conditions in the City and throughout the Commonwealth and that a water supply emergency continue[d] to exist in the City due to [then-]current water levels in the City's water supply sources for its public water system and anticipated demand ... which together necessitate[d] additional restrictions on the use of City-supplied water ...." Charlottesville, Va., Code § 31–125(a) (2002). There is no doubt that imposing water restrictions during a severe drought is a legitimate government purpose, a conclusion that the plaintiff does not challenge.

Second, the City's actions were rationally related to these legitimate ends. The Fourth Circuit Court of Appeals has held that "the relevant question under rational-basis review is whether local officials 'reasonably could have believed that [their] action was rationally related to a legitimate government interest.'" *Tri–County Paving, Inc.,* 281 F.3d at 439 (alteration in original) (quoting *Front Royal,* 135 F.3d at 290). Here, the City certainly could have believed that prohibiting "[a]ll washing of automobiles, trucks, trailers, and any other type of motor vehicle or mobile equipment" was rationally related to the conservation of water. It is rational for a community to decide that precious water resources should not be diverted to the washing of cars during a declared state of emergency.

Not to be deterred, the plaintiff complains that it was treated differently from similarly situated persons or businesses in Charlottesville. It is true that "a party can bring an equal protection claim by alleging that it has 'been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Tri–County Paving, Inc.,* 281 F.3d at 439 (citing *Village of Willowbrook v. Olech,* 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)). However, the plaintiff has not claimed that it has been treated differently from other businesses or persons *that wash cars.* There has been no allegation that other carwash facilities were permitted to operate or that individual citizens were allowed to wash their cars while the plaintiff was nevertheless restricted (or that either were granted exemptions from the ordinance while the plaintiff's request was denied). Therefore, the plaintiff has failed to state a valid equal protection claim. *See Tri–County Paving, Inc.,* 281 F.3d at 439–40.

### C. Remaining Claims

The magistrate judge recommended that the plaintiff's state law claims be dismissed once the corresponding federal claim had been dismissed as well. In its memorandum in opposition to the defendants' motion to dismiss and in its objections, the plaintiff raises no substantial argument that supplemental jurisdiction should be exerted over these claims if indeed the federal claims are dismissed. The court "may decline to exercise supplemental jurisdiction if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Finding no reason to disturb the recommendation of the magistrate judge, the court declines to exercise supplemental jurisdiction over the plaintiff's state law claims. Employing similar reasoning, the court also reaches the same conclusion with respect to the recommendation of the magis-

trate judge to dismiss the plaintiff's declaratory judgment claim.

The Clerk of the Court hereby is directed to send a certified copy of this Order to all counsel of record and to Magistrate Judge Crigler.

## FINAL ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is this day

### ADJUDGED, ORDERED, AND DECREED

as follows:

1. The plaintiff's objections to the Report and Recommendation, filed April 6, 2004, shall be, and they hereby are, OVERRULED.

2. The magistrate judge's Report and Recommendation, filed March 31, 2004, shall be, and it hereby is, ADOPTED.

4. The defendants' motions to dismiss, filed November 13, 2003, shall be, and they hereby are, GRANTED.

5. The above-captioned civil action shall be STRICKEN from the active docket of the court.

The Clerk of the Court hereby is directed to send a certified copy of this Order and the accompanying Memorandum Opinion to Magistrate Judge Crigler and to all counsel of record.