**Patricia HYATT, Plaintiff,**

v.

**TOWN OF LAKE LURE; H.M. (Chuck) Place, III; Terri Potts; Blaine Cox; George Pressley; and Lea Hullinger, Defendants.**

**No. CIV. 1:02CV94.**

United States District Court,
W.D. North Carolina,
Asheville Division.

Dec. 18, 2003.

---

William R. White, White & Dalton, Brevard, NC, J. Thomas Davis, Forest City, NC, for plaintiff.

Sandra M. King, Russell, King, & Johnson, P.A., Asheville, NC, for defendants.

## *MEMORANDUM OF OPINION*

THORNBURG, District Judge.

THIS MATTER is before the Court on the parties' timely filed objections to the Memorandum and Recommendation of United States Magistrate Judge Max O. Cogburn, Jr. Pursuant to standing orders of designation and 28 U.S.C. § 636, the undersigned referred the parties' cross-motions for summary judgment to the Magistrate Judge for a recommendation as to disposition. Having conducted a *de novo* review to those portions of the recommendation to which specific objections were filed, the Court grants the Defendants' motion. 28 U.S.C. § 636(b); Fed. R.Civ.P. 72.

### I. PROCEDURAL HISTORY

Plaintiff (Hyatt) initiated this action on April 24, 2002, alleging diversity and federal question jurisdiction in a dispute involving the erection of a seawall and boathouse on her property in Lake Lure, North Carolina. Complaint, filed April 24, 2002. On May 7, 2002, Hyatt's motion for a temporary restraining order was denied. Order, filed May 7, 2002. On August 27, 2002, the undersigned granted Hyatt's motion to amend her complaint but dismissed, on the Defendants' motions, her claims pursuant to 42 U.S.C. § 1983 against Defendants Place, Cox, Pressley and Hullinger in their individual capacities and the challenge to the facial validity of the Lake Structures Regulations. Memorandum and Order, filed August 27, 2002.

On September 9, 2002, Hyatt filed her amended complaint which alleges the following causes of action: (1) the Lake Structures Regulations are invalid and unenforceable because they violate the statutory requirements of Article 19 of Chapter 160A of the North Carolina General Statutes; (2) the Lake Structures Regulations violate Hyatt's substantive and procedural due process and equal protection rights; (3) an alternative claim that Hyatt is in compliance with the Regulations and/or that the Defendants are estopped from the enforcement thereof as to her property; and (4) a claim pursuant to § 1983. Amended Complaint, filed September 9, 2002. The Defendants answered and asserted a counterclaim for trespass. Answer to Amended Complaint, filed September 30, 2002.

Hyatt and the Defendants cross-moved for summary judgment on July 15, 2003. The Magistrate Judge recommended that Hyatt's motion for summary judgment on her substantive and procedural due process claims be granted and that the Defendants' motion for summary judgment as to the equal protection and estoppel claims be granted. Both Hyatt and the Defendants have filed objections to the Memorandum and Recommendation.

### II. SUMMARY JUDGMENT STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, ... show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Supreme Court has observed, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

*Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir.2003) (quoting Fed.R.Civ.P. 56(e) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson, supra*). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." *Bouchat, supra*, at 522 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the nonmoving party who must convince the Court that a triable issue does exist. *Id.*

> A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denial of [his] pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial." Furthermore, neither unsupported speculation, nor evidence that is merely colorable or not significantly probative, will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that reasonable minds could differ on a material point, then, regardless of any proof or evidentiary requirements imposed by the substantive law, summary judgment, if appropriate, shall be entered.

*Id.* (citing Fed.R.Civ.P. 56(e)) (other internal quotations and citations omitted). Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### III. FINDINGS OF FACT

It is undisputed that Hyatt acquired Lot 16B of Lurewoods Manor Phase Two in April 2001. On June 14, 2001, she applied for a Lake Structure Permit from the Town of Lake Lure (Town) to build a seawall and a boathouse with Hyatt acting as her own contractor. Exhibit 11, *attached to* Deposition of H.M. Place, III (Place), filed July 15, 2003. Hyatt was to submit the plans for these improvements at a later date. *Id.* Hyatt represented that the boathouse would be 15 feet from the side lot line with dimensions of 15 feet high, 30 feet long and 45 feet wide. *Id.* The water depth at the end of the boathouse would be six to eight feet. *Id.* The seawall would be four to five feet high, 100 feet long and six to ten feet wide. *Id.* The permit contained the following conditions which were accepted by Hyatt:

> Issuance of this permit does not abrogate the right of the Town of Lake Lure to flood to the 995 feet above sea level contour line, which right was confer[r]ed to the town by deed. Additionally, the town shall not be liable for harm to any structure erected on the waters of Lake Lure pursuant to this permit, absent gross negligence. Issuance of the permit does not constitute a waiver of any rights or defenses available to the town in the event of any damage or loss occur[r]ing to said structures. *The applicant understands that structures are allowed on Lake Lure only by permission of the town and the continued permission by the town to allow a structure on the lake does not confer any rights of ownership or possession.*

*Id.* (emphasis added). The permit was subject to approval by the United States Army Corps of Engineers (Corps). *Id.*

On the same day, Hyatt applied for a land disturbance permit for the boathouse and a driveway. Exhibit 12, *attached to* Place Deposition. Hyatt acknowledged in that application

> *I understand that I am responsible for any damage to adjacent property, including property of the Town of Lake*

*Lure, from erosion caused by land disturbing activity on the property which is the subject of this permit.* In the event sediment is deposited onto town property, *I will cause the sediment to be removed at my expense within 24 hours or, failing this, will reimburse the town for said removal.*

*Id.* (emphasis added).

On August 2, 2001, a Notice of Violation of the land disturbance permit was issued to Hyatt and a "Stop Work Order" was posted on the property. Exhibit 26, *attached to* Deposition of Terri Potts (Potts), filed July 15, 2003. The violation issued because Hyatt's contractor had not installed "proper erosion control measures [ ] to prohibit or limit the amount of erosion that [was] running into Lake Lure." *Id.* Despite prior warning and three visits to the site by Potts, the Town's zoning and ordinance administrator, the proper measures had not been taken. *Id.* The issuance of the notice suspended Hyatt's permits and resulted in a fine of $500 per day to both Hyatt and her contractor. *Id.*

Hyatt testified at her deposition that the first grading contractor she hired to construct a road to the shoreline did not complete the grading. Deposition of Patricia Hyatt, filed July 15, 2003, at 16. "And when he left he left the lot in a very bad condition, eroding condition and for three weeks in July we had heavy rains so it was a mess." *Id.* She actually sued that grader in small claims court and recovered the $500 fine imposed by the Town. *Id.,* at 16–17.

Hyatt also testified that the seawall was constructed before the boathouse was built and admitted that she did not obtain a building permit from the Rutherford County. Hyatt Deposition, at 22–23. During the construction of the seawall, Hyatt was aware that a significant amount

of erosion occurred. *Id.,* at 36. The erosion was obvious and Potts had spoken to her about it more than once. *Id.* Hyatt also admitted that prior to applying for the permits from the Town, she had read the Lake Structures Regulations promulgated by the Town. *Id.,* at 37–38.

The lot adjoining Hyatt's is owned by Lemuel Oates. At some point in the fall of 2001, Potts was advised that Hyatt's seawall encroached onto Oates' property. Place Deposition, at 28–31. "Hyatt was encroaching onto [Oates'] property with heavy equipment and digging up his lot." Potts Deposition, Vol. I, at 62. Potts then inspected the property and found that Hyatt's contractor had indeed dug an escarpment within the 12–foot set back, thus encroaching on Oates' property. *Id.,* at 43–46. Oates provided the Town with a copy of a survey of his property and Place[1], the Town manager, concluded, after reviewing Oates' survey and one for Hyatt's property as well as physically inspecting both parcels, that Oates was correct. Place Deposition, at 31–33. In addition, Place compared those surveys to the platted sub-division as it existed before the property was sold to Hyatt. *Id.,* at 40. As a result, he issued a notice of violation on November 21, 2001, which advised Hyatt that the seawall had not been built at the shoreline as it existed prior to the erection of the seawall, illegal filling of the lake had occurred, the boathouse encroached onto the Town's property in the lake and the seawall encroached onto Oates' property. Exhibit 5, *attached to* Place Deposition. Hyatt was required to submit a survey to the Town showing the property lines as they existed prior to and after the construction of the seawall and boathouse and she was assessed a $2,000 fine. *Id.*

1. Due to a lengthy illness of Potts, Place performed her job for some period of time.

Meanwhile, earlier in November 2001, Potts inspected Hyatt's boathouse and while taking measurements, realized that it was not in compliance with the permit. Potts Affidavit, *attached to* Defendants' Memorandum in Response to Plaintiff's Motion for Summary Judgment, filed August 1, 2003, ¶ 10. The boathouse was a foot and a half too big. Potts Deposition, Vol. I, at 46. In addition, Potts issued a stop work order to prevent the grading of a house site because Hyatt had not obtained a permit for a house site. *Id.,* at 46–53. Potts actually saw the grading in progress and told the contractor to stop work. *Id.* She left to go back to her office to obtain a stop work sign and by the time she came back, the contractor was working again. *Id.* Potts was advised that Hyatt had told her contractor to go back to work because Hyatt had resolved the issue with the Town. *Id.* This was not true. *Id.* Moreover, Hyatt had constructed a deck top accessory structure without having petitioned the Lake Structures Appeals Board for a permit. *Id.,* at 54–55.

On December 27, 2001, Place wrote to Hyatt again quoting the November 2001 notice which required her to do, among other things, the following:

"Within 30 days from the receipt of this notice, either show proof that you have the authority to locate the retaining wall on the adjacent property through purchase, easement or other means, or remove the offending wall and restore the property to its original condition." The 30 day time period expires on December 28. You have requested an extension of time from that final date, indicating that you have been in contact with Lemuel Oates, the adjacent property owner, and are working towards an agreement.

Exhibit 22, *attached to* Place Deposition. Place gave Hyatt an extension and noted that she had requested to and would appear before the Town Council on January 14, 2002. *Id.* That appearance concerned Hyatt's request for after-the-fact approval to fill a portion of the lake and to waive the fines assessed by the Town. During her appearance at the hearing, Hyatt made the following statements:

I closed on the lot on April 16th and I began after that by obtaining the city's Lake Structures regulations. I had to determine what type of sea wall to construct. . . . On June 14th, I obtained my land disturbance permit, presented my plans, obtained my zoning compliance permit, and paid my fees to the Town of Lake Lure. *I then proceeded to the Building Department of Rutherford County and obtained my boathouse permit.* On June 20th, I hired Doug Tate Grading to construct the road access to the lake. After a few weeks, he left the job before completing the access. He wouldn't go down any further than he had gone, which was not near the lake shore. I hired James Rich to build a sea wall. He was a well known builder of boulder walls in the Asheville vicinity . . . . I asked him to complete road access and build the sea wall. After looking at the lot, he backed out and said he would not put his equipment on that lot but agreed to haul the boulders. The third grader I obtained was R & B Grading.

. . . . .

After the erosion control measures were taken, work resumed. Construction of the sea wall took approximately two months to build. The work was [a] slow and tedious process and it was a dangerous one. Because of the steepness of the lot, a dump truck had to unload the boulders at the top of the hill at the entrance of the lot and one at a time the track, track hoe hauled these boulders down to shore. The bad undercut and the sandy soil made it (sic) certain areas

of the shore line unstable. The boulders were very heavy. On several occasions, the track hoe nearly landed in the lake.

Exhibit E, Clerk's Certification of Meeting of Lake Lure Town Council on January 14, 2002, *attached to* Defendants' Memorandum in Support of Motion for Summary Judgment ["Defendants' Memorandum"], filed July 15, 2003, at 2–3 (emphasis added). Hyatt acknowledged that the seawall encroached so much on Oates' property that he no longer had sufficient shore frontage to enable him to erect a lake structure. *Id.*, at 5–6; Hyatt Deposition, at 76. In fact, she admitted that the seawall encroached on her other neighbor's lot as well. Defendants' Exhibit E, *supra*. Moreover, it was pointed out that the boathouse was supposed to be no closer than 15 feet from the property boundary but was actually within 7 feet thereof. *Id.*, at 7.

Mr. Oates also appeared at the hearing and made the following comments to the Council:

I have talked to Ms. Hyatt on several occasions. And I have heard the same story about [she] had no idea [she was encroaching]. But according to her surveyor, he will tell you that she absolutely knew where that line was and right where to put all those rocks. And he is here to testify that she has worked it out with me. And she never talked to me [about that]. So, I ask you don't buy into everything you hear.... Ms. Hyatt was told by [her] contractor that she was going on her neighbors land. And she boldly said no, I worked out a deal with him[;] put the rocks right here.

*Id.*, at 7–8.

[W]hen I met with her, I told her we had a problem but she still went on and put that second [sea]wall over on me to[o]. I told Ms. Potts and she said Ms.

Hyatt had a survey that said she wasn't on my property. So that's why I had my surveyors come out and it was kindly upsetting to me then when I was paying for this surveyor and when I got there her builder knew exactly that they had built on me. And to go over again, I say, he told her on the sea wall, you are going over on the neighbor and she come back saying, "I've got a deal." So don't buy that she didn't know.

Exhibit II, *attached to* Plaintiff's Brief in Support of Motion for Summary Judgment ["Plaintiff's Brief"], filed July 15, 2003, at 22–23.[2]

Hyatt's contractor also testified at the hearing. After identifying himself as Ray Burleson of R & B Grading, Mr. Burleson stated:

[W]e started construction on the lot after several contractors had been there. [I]t was my understanding at the time that all the necessary permits, ah, the Army Corp. of Engineers or any lake disturbance permits that we needed that already have been taken care of. And, ah, *we were to build the wall out into the lake.* We built the wall directly under the directions of the owner. *Ah, and we spoke with Ms. Hyatt about that and she said I have an easement with Mr. Oates. Go ahead and build it.* We have a more or less what you call a gentleman's agreement.

Defendants' Exhibit E, *supra*, at 8 (emphasis added).

The Council voted 3 to 1 to deny the after-the-fact approval to fill the lake and to waive fines. Plaintiff's Exhibit II, *supra*, at 37. Hyatt asked the Council to reconsider their vote, stating that she simply could not afford to remove the seawall. *Id.*, 37, 41. Hyatt acknowledged, however,

**2.** The official transcript from the Town ended at page 14. Hyatt submitted as an exhibit a transcript which she typed herself upon listening to the tape-recording of the hearing.

that she would be responsible for removing that portion of the seawall which encroached on Oates' property. *Id.* This opened the matter up for further discussion, including additional comments by Council members. *Id.*, at 42.

> [W]e are elected officials and there are rules and regulations.... Mr. Place's letter to you also said that when you come before us "show proof that you have the authority to locate the retaining wall on the adjacent property ..." and it seems like that you still have some problems between yourself and the two separate property owners. If that had been resolved in writing before you came before the board, who knows how the discussion may have gone.

*Id.* Hyatt responded that she was still trying to work the matter out with Oates; however, the Council reminded her that she also had a problem with her other neighbor. *Id.*, at 43. "You are saying that everything is fine, but you are not showing us anything on it and I would just like for that to be noted." *Id.* The Mayor advised Hyatt that if she obtained a "substantial difference in the facts," she could come back to the Council and present those facts. *Id.* Hyatt asked if there was an appeal process and the Mayor responded:

> Well, the council has made a decision and that is the decision that needs to hold fast. I mean, if there is material facts that changes, perhaps the outcome will change, but I don't think agreements with the adjacent property owners changes the main issue and the main issue is extending into the lake. So unless there is a substantial material fact different than what's presented in

---

**3.** Plaintiff submitted this deposition as well as others for consideration. As a result, certain portions thereof which might otherwise be

that particular regard I think the Council has spoken.

*Id.*, at 43–44.

On January 16, 2002, Hyatt was notified by the Town that her request had been denied and she must either repair the situation or apply for variances with the Lake Structures Appeals Board. Exhibit 20, *attached to* Place Deposition. Hyatt, who had acknowledged previously that she had reviewed the Lake Structures Regulations, did apply for such variances pursuant to § 94.16 of the Regulations. That section provides in pertinent part:

> (A) Because of great differences in lot size, property topographies, location of adjacent homes, shoreline and road contours, location of ledges and other variables, the Lake Structures Appeals Board may grant a variance in special situations if the board believes equity so demands and no neighbor (adjoining property owner or other land owner whose projected boundary lines are affected) will have his view of the lake from his house obstructed or the ability to construct or alter lake structures within his projected boundaries impaired.

Exhibit 2 *attached to* Place Deposition, at 11. The regulations also provide that "Decisions of the Lake Structures Appeals Board shall be final unless appealed by the applicant ... to the Town Council within 30 days of the decision." *Id.*, at 12.

Prior to the hearing on Hyatt's application for a variance, Potts in her capacity as the Zoning Administrator, sent a memorandum to the members of the Appeals Board. Exhibit 1, *attached to* Deposition of Blaine Cox.[3] Potts made the following report in pertinent part:

---

considered hearsay have not been excluded, as Plaintiff herself tendered them for review.

The boathouse was overbuilt and the contractor had to cut off the overhangs to bring the size into compliance of the issued permit. The lake was filled extensively to create the seawall and created a new shoreline. Due to the location of the boathouse, both adjacent property owners feel that the structure will diminish their opportunity to develop their lots in the future. There are *no* agreements between any of the involved parties as to a resolution to this issue. (Despite evidence that might be submitted to the contrary.).

.    .    .    .    .

There have not been any of the required plans for construction submitted. Everything has been "forthcoming." Plans reviewed in the office were never finalized and submitted.

.    .    .    .    .

The first contractor quit due to the conflict with ordinance and the property owner[']s directions. Each contractor on that job has replied exactly the same way when questioned as to why they would build what was not applied for and permitted; "We are doing exactly what she tells us to do. She says she has already pulled all the permits and gotten the neighbors['] approval to do these things." The statement was made on several occasions that Mr. Oates and Ms. Hyatt had come to an agreement regarding the encroachment. This is not accurate. To date, to my knowledge, there has been no reconciliation of this matter. Mr. and Mrs. Oates are adamant that the wall come off their land, period. Mr. Stuart Spratt, the other adjacent owner, is just as adamant about encroachment on his lot. The amount of erosion or any other problem does not concern them. They also want it to be known that they were not represented by anyone nor did they give anyone authority to act as agent for them.

You will hear during the case that proof of permission is in hand. There is an e-mail from an[ ] individual acting as agent for Mr. Oates. However, that individual did not have permission to act on behalf of the Oates'; according to Mr. and Mrs. Oates.

*Id.*

Hyatt attended the hearing on February 19, 2002, in connection with her application to the Lake Structures Appeals Board for a variance which she justified as follows: "My 80 yr-old handicap (sic) mother needs shelter from the sun." Exhibit 30, *attached to* Potts Deposition. It was first noted that Hyatt's boathouse extended 43 feet out into the lake as opposed to the 30 feet required by the ordinances and the boathouse was not sufficiently far enough from the boundaries of each of the lots adjacent to Hyatt's property. Exhibit G, Clerk's Certification of Hearing of Lake Lure Lake Structures Appeals Board, February 19, 2002, *attached to* Plaintiff's Brief, at 1. Mr. Oates again appeared at the hearing and noted that if the variances were granted to Hyatt, she would be the only lake property owner with a boathouse of that size and in such close proximity to her neighbors. *Id.,* at 7–8. Hyatt advised the Board that she fully accepted the responsibility of having to remove that portion of the seawall which encroached onto Oates' property. *Id.* However, she still needed variances in order to keep the boathouse in the location on which it was built. *Id.* Hyatt admitted that the boathouse extended 43 feet into the water from the original shoreline as it existed prior to the construction of the seawall and that it encroached on the side setbacks of the adjacent properties. *Id.,* at 11. The Board found that there were no extraordinary and exceptional conditions pertaining to Hyatt's lot because of its size, shape or topography that were not also applicable to other lots in the same district; the

variances would confer on Hyatt special privileges that had been denied to other residents; and, a literal application of the provisions of the zoning ordinance would not deprive Hyatt of rights commonly enjoyed by other residents. *Id.,* at 14–15. As a result, the Board denied the variances to Hyatt. *Id.*

Hyatt appealed the decision and appeared with counsel at a hearing before the Town Council on May 14, 2002. Exhibit I, Clerk's Certification of Hearing of Lake Lure Lake Structures Appeals Board, May 14, 2002, *attached to* Defendants' Memorandum. Counsel argued that the variances were justified because of the steep cliff leading down to the water, the substantial erosion which had led to an unusual topography, and a shallow area at the water line which made it difficult to use a boathouse. *Id.,* at 3. Counsel argued as well that the set back lines required by the regulations were arbitrary because they had no relationship to the actual shoreline. *Id.,* at 4. He also argued that the set back requirements violated equal protection because Hyatt's lot ended up with less lake frontage when those set backs were applied than that possessed by her neighbors. *Id.* The Council unanimously voted to deny the appeal. *Id.,* at 11. Hyatt petitioned the North Carolina Superior Court in Rutherford County for review of this decision pursuant to N.C. Gen.Stat. § 160A–388(e) and simultaneously filed this action.

## IV. DISCUSSION

### A. Abstention

■ It must first be noted that when a " 'plaintiff[']s federal claims stem *solely* from construction of state or local land use

or zoning law, ... and absent exceptional circumstances ... the district courts should abstain under the *Burford*[4] doctrine to avoid interference with [local] ... land use policy.' " *Bryant Woods Inn, Inc. v. Howard County, Md.,* 124 F.3d 597, 602 (4th Cir.1997) (quoting *Pomponio v. Fauquier County Bd. of Supervisors,* 21 F.3d 1319, 1328 (4th Cir.1994)). When " 'federal claims [are] really state law claims,' because local zoning laws and decisions [are] the bases of the federal claims," abstention is appropriate. *Johnson v. Collins Entertainment Co., Inc.,* 199 F.3d 710, 721 (4th Cir.1999) (quoting *Pomponio, supra,* at 1326). This is true even when the complaint alleges claims based on federal question jurisdiction. *Id.* (citations omitted). Here, each of the claims raised by Hyatt are claims arising under "state law in federal law clothing." *Id.* The only reason the undersigned does not abstain at this juncture is because it would severely prejudice the parties by forcing them to repeat in the state court action the litigation which has already occurred.[5] That would be financially detrimental to all parties.

### B. Defendants' objection to the Magistrate Judge's finding that the regulations at issue are unconstitutionally vague

■ By previous decision, the undersigned dismissed the Plaintiff's facial challenge to the regulations at issue. *Hyatt v. Town of Lake Lure,* 225 F.Supp.2d 647, 659, 665 (W.D.N.C.2002). On the pending motions, the Magistrate Judge concluded that "the ordinance is unconstitutionally vague as applied to Plaintiff under both the Due Process Clause of the Fifth and

---

4. *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

5. The Court does note the distinction between abstaining and dismissing an action based on

*Burford* when the cause of action seeks monetary damages in addition to equitable relief. *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 730–31, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996).

Fourteenth Amendments and Law of the Land Clause of the North Carolina Constitution." Memorandum and Recommendation, filed October 10, 2003, at 26. It is first noted that whether a regulation is unconstitutionally vague is a question of law for the court. *United States v. Albers,* 226 F.3d 989, 992 (9th Cir.2000); *United States v. Balint,* 201 F.3d 928 (7th Cir. 2000); *Eckstein v. Melson,* 18 F.3d 1181, 1183 n. 4 (4th Cir.1994). Among the pertinent regulations are the following:

*§ 94.05 DESIGN AND CONSTRUCTION STANDARDS*

.          .          .          .          .

(A) The minimum shoreline width required to construct any lake structure shall be 100 feet . . . .

(B) No structure shall be placed in the water more than 30 feet . . . as measured to and from the shoreline. . . .

(C) No structure shall be located closer than 15 feet to any side lot line, as projected into the lake. The projection of the lot line shall be a straight line on the same bearing as the lot line. This provision does not apply to sea walls.

Exhibit 2, *attached to* Place Deposition, at 4–5.

*§ 94.07 SEA WALLS*

(A) Property owners are required to construct a sea wall on every lot with a lake structure . . . . The construction of the wall shall only disrupt the contour of the shoreline to a minimum. The application for the construction of a sea wall shall include the following:

(1) An existing site plan with an overlay showing any proposed changes to the contours and profiles of the shoreline.

.          .          .          .          .

(B) The sea wall must be constructed at the shoreline elevation of 990 feet MSL. Earth fills in areas below the shoreline are prohibited. (Note: Refer to

§ 94.05[F] for details on how to establish the shoreline elevation of 990 feet MSL.)

*Id.,* at 8.

*§ 94.05(F) HEIGHT*

(1) . . . Establishing the shoreline elevation of 990 feet MSL can be achieved by using a surveyor's level to shoot an elevation from the top of one or more of the sewer manholes which are all at 995 feet MSL or by calling the Town Office for the lake level reading at the dam on that particular day.

*Id.,* at 5.

*§ 94.02 DEFINITIONS*

For the purpose of this chapter, the following definitions shall apply.

*"Boathouse."* Any roofed structure enclosed with walls containing one or more slips designed principally for permanent or temporary storage and/or housing of water-craft.

.          .          .          .          .

*"Distance from the shoreline."* Measured from the contour elevation of 990 feet MSL.

.          .          .          .          .

*"MSL."* The elevation above mean sea level, United States Geological Survey datum.

.          .          .          .          .

*"Sea Wall."* A structure built along the shoreline to resist the erosion of the land caused by the lake and which can also be used to moor boats and as a structure to receive and discharge a boat's passengers and cargo.

.          .          .          .          .

"*Shoreline.*" The line where the land and water meet most of the year which is at the elevation of 990 feet MSL.

*Id.*, at 1–2.

§ *94.12 DREDGING AND FILLING*

No dredging or filling of the lake shall be allowed except by specific authorization of Town Council.

*Id.*, at 10.

§ *94.15 PROHIBITED USES*

The following uses or activities shall be prohibited unless written approval is given by the Lake Structures Appeals Board.

(A) Any activity such as dredging or filling which alters the shoreline other than as required by action of the Town Council.

(B) The cutting of standing trees at or below the lake boundary.

*Id.*, at 11.

The Magistrate Judge concluded that the regulations, as applied to Hyatt, failed to provide her with fair notice of prohibited conduct because the definition of "shoreline" was subject to more than one reasonable interpretation. As a result, Hyatt was deprived of substantive due process.[6]

A regulation is unconstitutionally vague "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). If a regulation is not "sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties," and if "men of common intelligence must necessarily guess at its meaning and differ as to its application," it is unconstitutionally vague. *Tri County Paving, Inc. v. Ashe County*, 281 F.3d 430, 441 n. 9 (4th Cir.2002) (internal quotations and citations omitted). Because land use is an inherently discretionary system, the amount of discretion afforded local zoning and land use boards in determining whether a particular land use is permissible is exceptionally high. *AT & T Wireless PCS, Inc. v. Winston–Salem Zoning Bd. of Adjustment*, 172 F.3d 307, 316 (4th Cir.1999). And, "[v]agueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis." *Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

The Magistrate Judge concluded that because two different surveyors, Nathan Odom and Charles Hampton, reached different conclusions as to the location of the shoreline, the regulation was of necessity vague. This conclusion, however, is not supported by the deposition testimony of those surveyors.

Odom surveyed the property for Hyatt and testified that he did not "disagree with any of [Hampton's] testimony."[7] Deposi-

---

**6.** Hyatt does not argue that the actions of the Town were so arbitrary as to deny her substantive due process. This argument would have been to no avail. In the context of land use and zoning, such a claim will not be stated unless the town's action " 'has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense.' " *Nectow v. Cambridge*, 277 U.S. 183, 187–88, 48 S.Ct. 447, 72 L.Ed. 842 (1928) (quoting *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926)). Such a claim can survive only if the purpose behind the regulation has no conceivable rational relationship to the exercise of the traditional police powers through zoning. *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 126, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).

**7.** Hampton was the expert retained by the Town.

tion of Nathan Odom, at 6. In fact, he "totally agree[d] with it." *Id.*, at 7. Moreover, Odom testified that any interpretation of the ordinance was unnecessary and Hampton had more experience in "the interpellation of the contour lines." *Id.* "I know there's methods and ways that you can make assumptions and go back and reproduce something but I don't have that skill." *Id.*, at 48. In 1999, Odom prepared a survey of Lurewoods Manor, Phase Two, which settled "the overall boundary from which Mrs. Hyatt's property was derived." *Id.*, at 11–12. At that time, the property line for the lake boundary was the shoreline. *Id.* Between 1999 and 2003, when Odom prepared his most current survey, "the shoreline's changed." *Id.* "[W]hen she built the seawall it changed out to the edge of her seawall." *Id.* Odom first surveyed the shoreline in 1996. *Id.*, at 14. "Now why it's different here, apparently there's been some work done. I don't know what went on, except that there's a seawall there now." *Id.* Odom could not testify that the seawall had been built where the lake meets the land. *Id.*, at 14–15. He could testify that the seawall was not located at the spot at which he located the shoreline in the 1996 survey. *Id.*, at 15–16. Odom also testified that he had never surveyed a seawall which had been placed in a location so different from the original shoreline. *Id.*, at 27. In fact, in an extreme instance, the seawall would only vary up to six feet. *Id.*, at 46. When the footings for a seawall are dug, the shoreline is of necessity disturbed. *Id.*, at 41. As a result, it is necessary to refer back to "exactly where [the shoreline] was [via] measurements, either set some offset stakes or a survey or some way to come back exactly where [the shoreline] was." *Id.* In the most recent revision of the survey conducted for Hyatt, Odom marked the location of the shoreline as it existed in 1999. *Id.*, at 47. That location was further back than the point where the land

met the water after the construction of the seawall due to filling into the lake. *Id.*

According to the plat notes made by Odom on his most recent revision of the survey,

> [t]he lake structures ordinance states that seawalls must be built at the shoreline, determined as the 990(MSL).... The details for determining the 990(MSL) [are] actually described in 94.05(F)(1). Two methods are described. One is to determine the 990 by a comparison to the lake level reading at the dam on a given day. The other is to use the tops of manholes as bench marks and the tops of the manholes are to be given a reference of 995. The two methods described are inconsistent since the elevation of 995 for the tops of the manholes does not correspond to the lake level readings at the dam.... In my professional opinion, based on these observations, old deeds, and historical comments, the elevation of the shoreline (the present 990 based on NAVD 1988) is the same as the old 992 contour referenced on old deeds. The old 995 would be the present day 993.

Exhibit 7, *attached to* Odom Deposition.

Thus, Odom concluded, there was, at most, a three-foot difference in locating the shoreline depending on whether one used the reading of the lake level at the dam or the tops of manholes. Odom also testified that "[t]he manholes are about three foot (sic) higher and everybody thought the manholes were 995, so the 992 should be the old historical lake level prior to 1927 and the manholes were 995." Odom Deposition, *supra*, at 23. However, the Court notes that, using either method, Hyatt's seawall was nowhere near the shoreline as it existed before the construction. *Id.*, at 46. Odom did not testify that Hyatt's seawall as constructed was located at the shoreline as it existed prior to con-

struction. Indeed, he testified to the opposite, *i.e.*, the shoreline after construction was now at the seawall location.

Hampton, who was hired by the Town to survey the shoreline, first found "the location of the edge of the lake at some point after the property was subdivided, which I believe was 1999" and prior in time to the construction of Hyatt's seawall. Deposition of Charles O. Hampton, Jr., at 13. Both Odom and Hampton located the original shoreline prior to 1999 at the same location on their respective surveys and that location was approximately 13 feet inland from the point at which Hyatt constructed her seawall. Odom Deposition Exhibit 7, *supra;* Exhibit 1, *attached to* Hampton Deposition; Hampton Deposition, *supra,* at 26–28.

However, Hampton, unlike Odom, also surveyed the location of the shoreline as it existed immediately prior to Hyatt's seawall construction. *Id.,* at 30–32. "On [Odom's] survey, I don't think he indicates where the shoreline was prior to construction. He indicated where the 990 contour is, not was." *Id.,* at 32. Odom, in fact, admitted this during his deposition. Odom Deposition, at 14–15. However, Hampton, like Odom, recognized that there is a three-foot difference between readings taken at the top of the manholes, 995 MSL, and those taken at the dam. *Id.,* at 33–34. And, Hampton, who based his survey on the dam level, testified that the reason for the second option in the regulation, the option of measuring from the manholes, was provided for those times when the lake level was below normal. *Id.,* at 35. In any event, the 990 MSL shoreline located by Hampton was well inland from the location of Hyatt's seawall. Hampton Deposition Exhibit 1, *supra.*

Hampton also testified that the definition of "shoreline" provided by the regulation as being the place where the land and water meet was in accord with "normal surveying practice." Hampton Deposition, at 46.

Bob Cameron, who actually constructed the seawall, provided an affidavit in which he averred that in August 2001 he estimated that shoreline on Hyatt's property had eroded from its original location by at least 20 feet. Affidavit of Bob Cameron, filed July 15, 2003. No explanation in support of this claim was provided and Cameron did not attest that he had personal knowledge of the shoreline at any point prior to that time.

> The lake side of the lot, at the time [my] work started in early August of 2001, had a steep bank extending down approximately ten to fifteen feet to a sandbar which then extended out into the water approximately twenty feet *from the bottom of the bank* to a water depth of approximately two to three feet, where the lake bottom then made a steeper drop down into the lake.... [I] constructed the seawall *out near the lakeside of the sandbar by digging down into the lake bottom under where the present seawall is located and stacking large boulders in the dug out area* in order to build up the existing seawall[.]

*Id.* (emphasis provided). No explanation was given as to why the seawall was not constructed at "the bottom of the bank." *See, e.g.,* Hyatt Deposition, at 88–89.

The undersigned does not agree with the Magistrate Judge that the regulation was unconstitutionally vague as applied to Hyatt. The regulation provided two alternative methods for establishing the location of the shoreline, methods which resulted in at most a three foot discrepancy. Moreover, the Town's expert, Hampton, testified that the manhole method should be used only when the lake level was below normal. The regulations plainly prohibited any filling of the lake and clearly alerted property owners that the seawall

must be constructed at the shoreline. Hyatt admitted that she had read and consulted those regulations. If she had any doubt as to the location of the shoreline, all she had to do was to call the Town Manager for the water level at the dam or instruct her contractor to do the same. Hyatt, however, testified that there were "absolutely no conversation[s] about any problems or concerns that [her contractor] or anyone else from [her contractor] had about the placement of the seawall[.]" Hyatt Deposition, at 34. Nonetheless, Hyatt admitted that "after [she] read the Lake Structure Regulations [she] certainly knew what they required of property owners[.]" *Id.*, at 38. And, she identified photographs taken prior to the seawall construction which showed the shoreline inland from the actual construction site of the seawall. *Id.*, at 46. "[P]eople of common intelligence [could] determine the meaning of [the regulations'] terms." *Tri County Paving, supra.* And, the fact that the options provided for determining the shoreline could result in a three foot discrepancy does not render the regulations vague as applied to Hyatt.. *Lytle v. Doyle,* 326 F.3d 463, 469 (4th Cir.2003). Either option would have met the standard established by the regulation. " '[T]he ability to clarify the meaning of the regulation by [her] own inquiry, or by resort to the administrative process' " shows the regulation is not unconstitutionally vague. *United States v. Doremus,* 888 F.2d 630, 635 (9th Cir.1989) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)). Cameron, Hyatt's contractor, averred that he built the seawall out onto the sandbar rather than at the "bottom of the bank;" *i.e.,* the water's edge. Cameron Affidavit, *supra.* The problem in this case is not that. Hyatt could not ascertain the meaning of the regulation but that she constructed her

seawall in either total disregard or without any consideration thereof. *Doremus, supra.* In such a scenario, the regulation "as applied" to Hyatt was not vague. *See, e.g., United States v. Klecker,* 348 F.3d 69, 72 (4th Cir.2003) ("Some courts have concluded that a defendant who had actual notice that his conduct was unlawful cannot prevail on a vagueness challenge."); *United States v. Welch,* 327 F.3d 1081, 1100 (10th Cir.2003) (" 'Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.' " (quoting *Boyce Motor Lines v. United States,* 342 U.S. 337, 340, 72 S.Ct. 329, 96 L.Ed. 367 (1952))); *Thomas v. Hinson,* 74 F.3d 888, 889 (8th Cir.1996) (Regulation prohibiting the operation of an aircraft in a reckless manner was not unconstitutionally vague as applied to co-pilot in single pilot plane who failed to check pilot's statement that landing gear were lowered.); *Craft v. Nat'l Park Serv.,* 34 F.3d 918, 923 (9th Cir.1994) ("The ALJ concluded that appellants 'set out with their picks, hammers ... and other wreck raiding paraphernalia, fully intending to remove objects from these wrecks in the closed areas within the Sanctuary, and that is what they did.' Given these undisputed facts, appellants' claims that they lacked fair warning that their actions were prohibited ring hollow."); *United States v. Ellen,* 961 F.2d 462, 467 (4th Cir.1992) ("[T]he record is replete with indications that Ellen possessed actual knowledge that he was working in wetlands. As early as October 1987, for example, a civil engineer hired by Ellen to provide surveying assistance at Tudor Farms told Ellen that environmental maps indicated that Ellen was working or planning to work in wetlands ... [a]nd in February and March 1988, Corps enforcement officials toured Tudor Farms with Ellen and indicated to him areas that were wetlands." As a result, the regulation was not unconstitutionally vague as applied to Ellen.).[8] "Moreover, the fact that estab-

---

**8.** Hyatt also argued that the definition of

"shoreline" is ambiguous because the regula-

lished state procedures were available to address and correct illegal actions by the [Town] belies the existence of a substantive due process claim." *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 829 (4th Cir.1995); *accord, Southern Blasting Serv., Inc. v. Wilkes County, NC*, 288 F.3d 584, 594 (4th Cir.2002); *Tri County Paving*, 281 F.3d at 440; *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal, Va.*, 135 F.3d 275, 288 (4th Cir.1998) (The fact that the state court was capable of, and in fact did, rectify the situation proved no violation of substantive due process.).

## C. Objections to the Magistrate Judge's conclusion that Hyatt was deprived of procedural due process

■ In moving for summary judgment, Hyatt relied on language in the undersigned's previous decision to launch her argument that her procedural due process rights have been violated. *Hyatt*, 225 F.Supp.2d at 660–61. That decision, however, was based on a motion to dismiss filed before discovery had occurred. As such, the rulings of that decision are the law of the case only to the extent that subsequent discovery did not invalidate the presumptions upon which the motion to dismiss were based.

■ The Magistrate Judge found that Hyatt was denied an opportunity to appeal the issues of the seawall and boathouse locations, finding the only review provided by the Town was limited to her after-the-fact application for permission to fill the lake and for a waiver of the monetary penalties. "Defendant Place instructed Plaintiff that she had to request variances, a waiver, and after-the-fact permission to do what he accused her of doing, but she

did not have an opportunity to contest his crucial determination that her seawall and boathouse were built on the shoreline." Memorandum and Recommendation, at 28. This conclusion misses the link between permission to fill the lake and the locations of the seawall and boathouse. In locating and constructing her seawall 13 feet from the shoreline as it existed prior to that construction, Hyatt filled the lake without permission from the Town. Had her request for after-the-fact permission to fill the lake been granted, then the locations of the seawall and boathouse would have been proper. The three issues are inexorably combined.

Viewing the issues in this manner, it is necessary to ascertain what process Hyatt in fact received. She applied for and received permission to erect two lake structures, the boathouse and seawall, and to disturb land in connection therewith. She did not receive a building permit for a boathouse from the County. And, she failed to obtain a permit for a deck top accessory structure from the Lake Structures Appeals Board. By letter from the Town in November 2001, Hyatt was notified that she had improperly filled the lake in violation of the land disturbance permit. "This means that you are in violation of your lake structure permit for the seawall since the wall was not built at the shoreline as it existed before the illegal filling." Place Deposition Exhibit 17, *supra*. "It also means that the new boathouse is in violation of [the regulation] regarding the distance at which a lake structure can project into the lake (the distance must [be] measured from the previously existing shoreline, not the illegal one). Finally, you have encroached onto your neighbor's

---

tions do not make clear whether this refers to the shoreline as it existed when the lake was formed or when the seawall is placed on the property. This argument borders on the friv-

olous because the regulation clearly defines shoreline as the "line where the land water meet *most of the year* ...." This is a plain reference to a contemporaneous point.

property" which also violated the land disturbance permit. *Id.* Each subsequent violation stemmed from the original problem: improperly filling the lake so as to alter the shoreline. Hyatt was provided an opportunity (1) to prove by survey that the Town's determinations were incorrect; (2) to request after-the-fact permission to fill the lake; (3) to apply for a variance for the location of the boathouse; and/or (4) to prove to the Town that she had obtained easements or other agreements from her neighbors as to the encroaching seawall. Hyatt did not at that time submit a survey to show the Town was incorrect; instead, she requested after-the-fact permission to fill the lake. Had that request been granted, the other violations, with perhaps the exception of the encroachments, would have become non-existent. She also requested and received a hearing on that request on January 14, 2002. At that hearing, Hyatt admitted that her seawall encroached onto her neighbors' property and acknowledged her responsibility to remove the encroachments. Hyatt's request for after-the-fact permission to fill was denied. This denial meant that she could not keep her seawall or boathouse in their current location because that location was predicated on permission to leave the fill where it ended up as a result of illegal filling of the lake which occurred during the construction of the seawall.

Hyatt was then notified that her next step was to either comply or apply for the necessary variances. Hyatt did not dispute the fact that she was obligated to remove the encroaching portions of the seawall. However, she did pursue a variance for the seawall and the boathouse's location in conjunction with that seawall. Hyatt could not keep the boathouse at its location as built unless she received a variance allowing her to keep the seawall on her property at its location "as built." Otherwise, she would have to restore the shoreline to its configuration as it existed prior to the improper filling of the lake. Hyatt was denied a variance and appealed to the Town Council, as provided in the regulations. That appeal was denied and she then commenced litigation in state court. At each step, Hyatt requested and received review of each issue which, like the "domino effect," all were ultimately linked to the issue of improperly filling the lake. At each review, she argued and submitted evidence, including a survey, which she claimed showed the proper location of the seawall and, linked thereto, the location of the boathouse.

The issue then is the amount of procedural due process to which Hyatt was entitled.[9]

Due process of law generally requires that a deprivation of property be preceded by notice and opportunity for hearing appropriate to the nature of the case. However, to determine whether a procedural due process violation has occurred, courts must consult the entire panoply of predeprivation and postdeprivation process provided by the state. The procedures due in zoning cases, and by analogy due in cases such as this one involving regulation of land use through general police powers, are not extensive. For example, the Supreme Court held in *City of Eastlake v. Forest City Enterprises, Inc.,* 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132[ ] (1976), that a local government could, consistent with the Due Process Clause, make zoning decisions through the political process in a

---

9. For purposes of this decision, it is assumed *arguendo* that Hyatt had a property interest.

*Sylvia Dev. Corp., supra.*

referendum with no hearings of any kind.

. . . . .

[Hyatt] was provided with more than constitutionally adequate pre- and post-deprivation process in this case. [Hyatt] failed to take advantage of [the state court process]. And when [Hyatt] did take advantage of the available process, the outcome was not what [she] had hoped for. But procedural due process does not require certain results—it requires only fair and adequate procedural protections.

*Tri County Paving,* 281 F.3d at 436 (internal quotations and citations omitted). Hyatt was provided full notice by the November 2001 and subsequent letters. *Id.,* at 437. She asked for and received an opportunity to appear before the Town Council. *Id.* At that hearing on January 14, 2002, the Council listened to Hyatt, her neighbor and her contractor. *Id.* When after-the-fact permission to fill the lake was denied, Hyatt was advised to seek a variance, which she did. *Id.* On February 19, 2002, Hyatt received a hearing on this application as well during which she was again presented an opportunity to comment and argue. *Id.* However, the variance was denied and Hyatt appealed that decision to the Town Council which provided her with yet a third hearing on May 14, 2002. *Id.* This time, Hyatt was represented by counsel who presented the survey prepared by Odom and argued due process and equal protection issues, among other things. *Id.* Once again, Hyatt's request was denied; however, she then pursued her right to petition the state court. *Id.* Hyatt, however, chose to stay that proceeding in favor of this one.

[Hyatt] simply lost the [ ] battle in the [Town]. If, as *Eastlake* teaches, a community can make land-use decisions through a popular referendum with no hearings of any kind and still satisfy the mandates of due process, certainly conducting open community meetings and giving affected parties the opportunity to speak on behalf of their project is constitutionally sufficient. However, predeprivation process was not the only avenue open to [Hyatt]. Postdeprivation process was likewise available. And a due process violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process.

. . . . .

[Hyatt] had remedies available to [her] in the state courts but chose not to utilize them. For example, [Hyatt] could have petitioned a state court for a writ of mandamus to compel the [Council] to issue [the variances] if [they were] unlawfully withheld. North Carolina courts have stated that mandamus is the proper procedure to compel local officials to issue a ... permit when a party shows that it has met all of the permit requirements.... [Hyatt] chose not to pursue [this] avenue[ ] of relief in the state courts. [She] cannot complain now that the state did not provide adequate procedures.

*Id.,* at 437–38 (internal quotations and citations omitted); *accord, Greenbriar Village, L.L.C. v. City of Mountain Brook,* 345 F.3d 1258, 1264 (11th Cir.2003) (Failure to "exploit available remedies ... basically waives one's right to complain"); *Sylvia Dev. Corp.,* 48 F.3d at 827 (Arguing the Board's decision was not supported by evidence does not show a lack of due process. "[T]he County Board duly conducted an open hearing, following notice, at which it heard the positions of all interested parties. And following the hearing, the Board made a decision and stated its reasons. Aggrieved by the decision, the appellants were entitled to appeal and did appeal to

the Circuit Court ....."); *McCauley v. City of Jacksonville, NC,* 739 F.Supp. 278, 283 (E.D.N.C.1989), *aff'd,* 904 F.2d 700 (4th Cir.1990).

### D. Hyatt's objections to the Magistrate Judge's findings as to equal protection claims

Hyatt objects to the conclusion that no equal protection rights were violated by the actions of the Defendants by merely citing to the previous arguments raised in her brief in support of summary judgment. This Court conducts a *de novo* review only of those portions of the recommendation to which specific objections are filed. 28 U.S.C. § 636(b); Fed.R.Civ.P. 72; *Orpiano v. Johnson,* 687 F.2d 44, 48 (4th Cir.1982). "In this Circuit, *de novo* review is unnecessary 'when a party makes general and conclusory objections that do not direct the court to specific error in the magistrate's proposed findings and recommendations.'" *Strawbridge v. Sugar Mountain Resort, Inc.,* 243 F.Supp.2d 472, 475 (W.D.N.C.2003) (quoting *Orpiano, supra* ). "A general objection ... has the same effect as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the magistrate useless." *Id.* (quoting *Howard v. Secretary of HHS,* 932 F.2d 505, 509 (6th Cir.1991)). Thus, having reviewed the Magistrate Judge's recommendations as to the equal protection claims under a careful standard, this Court adopts the same.

### E. Hyatt's objection to the Magistrate Judge's recommendation that due process and equal protections claims against Defendant Potts be dismissed

For the same reasons as stated above, the objection is rejected. Because the recommendation is that the claims against Potts be dismissed, the objection filed by

the Defendants to the issue of quasi-judicial immunity is moot.

### F. Hyatt's objection to the Magistrate Judge's recommendation concerning declaratory judgment

For the same reasons as stated above, the objection is rejected. Moreover, having found that the Defendants have not violated Hyatt's due process and equal protection rights, she is not entitled to a declaration that she is in compliance with the regulations or, alternatively, to a variance.

### G. Hyatt's objection to the Magistrate Judge's recommendation concerning estoppel

For the same reasons as stated above, the objection is rejected.

### H. The parties' objections to the Magistrate Judge's recommendation concerning monetary damages

Because the undersigned has concluded that no constitutional rights have been violated, monetary damages are not at issue as to those claims. A party may not state a claim pursuant to 42 U.S.C. § 1983 without making a *prima facie* showing of a violation of a constitutional right by a state actor. *Tri County Paving, supra.*

### I. Hyatt's objection to the Magistrate Judge's failure to recommend summary judgment in her favor as to the Defendants' counterclaim for trespass

The Town's counterclaim alleges that by extending her boathouse 43 feet into the lake, Hyatt has trespassed on the Town's land. Because Hyatt's request for declaratory judgment has been denied and the Defendants' motion for summary judgment granted, this Court has made a finding of fact that the shoreline as it existed prior to

construction of the seawall was at the location specified by Hampton and Odom. Thus, the Town arguably has a viable claim for trespass. The relief sought in the counterclaim, however, does not request monetary damages but "abatement and a mandatory injunction requiring the Plaintiff to remove the seawall and fill, reconstruct the shoreline to its original location, and to remove and relocate the boathouse." Answer to Amended Complaint, filed September 30, 2002, at 9. However, Hyatt has a state court action which has been stayed pending the outcome of this matter and the Town may determine to assert any claim for trespass in that action or a new one. Because the relief sought by the Town is equitable only, the undersigned will dismiss the trespass claim without prejudice to renewal in the event the matter is not otherwise resolved. *Quackenbush, supra.*

### V. ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's motion for summary judgment is hereby **DENIED**; the Defendants' motion for summary judgment is hereby **GRANTED**; and the Defendants' claim for trespass is hereby **DISMISSED** without prejudice.

A Judgment is filed herewith.

### *JUDGMENT*

For the reasons set forth in the Memorandum of Opinion filed herewith,

**IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED** that the Plaintiff's motion for summary judgment is **DENIED**; the Defendants' motion for summary judgment is **ALLOWED**; the Defendants' counterclaim for trespass is **DISMISSED WITHOUT PREJUDICE**; and the Plaintiff's claims are hereby **DIS-**MISSED WITH PREJUDICE in their entirety.